FOR PUBLICATION

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

In the Matter of : Case No. 13-30571/JHW

Guy Varquez and Kathleen Varquez :

**OPINION**

Debtors :
_____

APPEARANCES:  Joseph Frank, Esq.
575 Route 70, 2nd Floor
P.O. Box 1030
Brick, New Jersey  08723
Counsel for Sparrow Investments, LLC

Richard S. Hoffman, Jr., Esq.
Hoffman DiMuzio
412 Swedesboro Road
Mullica Hill, New Jersey  08062
Counsel for the Debtors

> **FILED**
> JAMES J. WALDRON, CLERK
>
> December 13, 2013
>
> U.S. BANKRUPTCY COURT
> CAMDEN, NJ
> BY:  s/ Theresa O'Brien, Judicial
>      Assistant to Judge Wizmur

In this matter, a tax sale certificate holder seeks relief from the automatic stay to continue with the sale of the debtors' principal residence, acquired by the movant through a foreclosure judgment.  The debtors seek to cure the outstanding amount due for their real estate taxes through their proposed Chapter 13 plan, and the return of their home.  The debtors contend that the involuntary transfer of their property may be avoided pursuant to either 11 U.S.C. § 547 as a preferential transfer, or 11 U.S.C. § 548 as a fraudulent transfer.  While it appears that the transfer of the debtors' property cannot be avoided as a preferential transfer because the transfer occurred outside of the 90 day preference period, see 11 U.S.C. § 547(b)(4)(A), the debtors may be able

to establish that the judgment of foreclosure is avoidable as a fraudulent transfer under 11 U.S.C. § 548(a)(1)(B).  The creditor's motion for relief is denied without prejudice.

## FACTS

Guy P. and Kathleen M. Varquez filed a voluntary petition under Chapter 13 of the Bankruptcy Code on September 19, 2013.  The debtors' residence at 207 Summit Avenue in Mantua Township, New Jersey was listed with a value of $135,735.00 and no encumbrances.  The debtors scheduled Mantua Township with a claim for real estate taxes in the amount of $35,999.76, noting in their Statement of Financial Affairs that a tax sale certificate holder had obtained a judgment of foreclosure against the debtors prior to the filing of their petition.  The debtors' Chapter 13 plan proposes to pay $1,200 a month for 60 months to satisfy all administrative and priority claims, including the delinquent real estate taxes, and to pay a 100% dividend to unsecured creditors.

On October 1, 2013, Sparrow Investments, LLC (hereinafter "Sparrow") moved for relief from the automatic stay to proceed with the sale of the debtors' residence.  A tax sale had been conducted against the property on or about December 4, 2009, and the successful bidder assigned the tax sale certificates to Sparrow on May 29, 2013.  Sparrow filed a complaint to foreclose the debtors' right of redemption, and with the entry of a final judgment of

foreclosure on the tax lien on June 20, 2013, Sparrow acquired fee simple title to the debtors' residence. A writ of possession, also issued on June 20, 2013, was executed on September 18, 2013. Sparrow contends that the debtors no longer own or occupy the property and that it does not constitute property of the debtors' bankruptcy estate.

The debtors oppose Sparrow's motion, certifying in part that Guy Varquez had no notice of the delinquency on real property taxes due to Mantua Township, because his wife failed to inform him about it. As well, Mr. Varquez complains that he had no notice of the fact that a foreclosure had occurred until he came home to find the sheriff evicting him from the property. According to the debtors, at the time that the complaint and summons for the lawsuit filed against the debtors were served at the residence, the debtors were separated, and Guy Varquez was not living in the home. They also contend that Sparrow improperly changed the locks on the home and listed the property for sale following the filing of their bankruptcy petition on October 7, 2013, in violation of the automatic stay.

In response, Sparrow contends that Guy Varquez's alleged lack of notice is without merit, and that the movant complied with all state law noticing requirements. Sparrow explains that the debtors were legally removed from the property prepetition pursuant to the judgment of foreclosure and writ of possession, but that the movant subsequently granted the debtors access to

3

the property to retrieve their possessions.  When the debtors failed to vacate the property, the movant changed the locks on October 7, 2013 to prevent further trespassing.  Sparrow contends that the debtors have no standing to avoid an alleged preferential or fraudulent transfer.  Finally, Sparrow asserts that a tax foreclosure is not an avoidable preference under 11 U.S.C. § 547, or an avoidable fraudulent conveyance under 11 U.S.C. § 548.

## **DISCUSSION**

Several issues raised by the parties, both in support of and in opposition to the motion for relief from the automatic stay, can be readily disposed of.  First, Sparrow is correct that as of the date of the filing of the petition, the automatic stay was not in effect as to the property in question, because the debtors' interest in their former residence had been extinguished prior to the filing.  Section 362(a)(3) proscribes any post-petition act "to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate."  11 U.S.C. § 362(a)(3).  Property of the estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case."  11 U.S.C. § 541(a)(1).  The nature and extent of the debtors' interest in property are defined by state law.  Butner v. U.S., 440 U.S. 48, 55, 99 S. Ct. 914, 918, 59 L.Ed.2d 136 (1979).  Under the New Jersey Tax Sale Law, when a final judgment of foreclosure is entered, "an absolute and indefeasible estate of inheritance in fee simple" may be vested in the purchaser.

4

N.J.S.A. § 54:5-87. In fact, the June 20, 2013 judgment did just that.[1] The writ of possession issued against the property was executed the day before the bankruptcy filing. As a result, at the time of the filing, the debtors had lost their legal and equitable interest in the property. Sparrow's motion for relief from the stay is actually a request for a comfort order that the automatic stay does not apply, and that Sparrow may proceed to protect its interests outside of the bankruptcy process. See 11 U.S.C. § 362(j). On this record, I conclude that no violation of the automatic stay occurred.

Second, the debtors' challenge to the state court judgment on the ground that Guy Varquez had no notice of the debtors' default on their real estate tax obligations, and was not properly served with the complaint, must fail. Under the Rooker-Feldman doctrine,[2] this court cannot serve as an appellate forum to challenge decisions made in the state courts. See Exxon Mobil Corp. v. Saudi Basic Industries Corp., 544 U.S. 280, 284, 125 S. Ct. 1517, 1521-22, 161 L.Ed.2d 454 (2005) (doctrine applies to "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the

---

[1] "IT IS therefore on this 20th day of June, 2013, ORDERED AND ADJUDGED that the Defendants, GUY P. VARQUEZ, KATHLEEN M. VARQUEZ and THE STATE OF NEW JERSEY and all persons claiming by, from or under them, stand absolutely debarred and foreclosed of any and all right, and equity of redemption, in and to the lands and every part thereof, . . . [and it is further] ORDERED AND ADJUDGED that the Plaintiff, SPARROW INVESTMENTS, LLC . . . is vested with an absolute and indefeasible estate of inheritance in fee simple to the premises above described." Motion for Relief from Stay, Exh. A, Final Judgment of Foreclosure, 6/20/13.

[2] The doctrine takes its name from two U.S. Supreme Court decisions which were rendered 60 years apart: Rooker v. Fidelity Trust Co., 263 U.S. 413, 44 S. Ct. 149, 68 L.Ed. 362 (1923) and District of Columbia Court of Appeals v. Feldman, 460 U.S. 462, 103 S. Ct. 1303, 75 L.Ed.2d 206 (1983).

district court proceedings commenced and inviting district court review and rejection of those judgments"); Howell v. Young, 530 Fed.Appx. 98, 100 (3d Cir. 2013) ("The Rooker–Feldman doctrine deprives federal district courts of jurisdiction 'over suits that are essentially appeals from state-court judgments.'"). Because the issues raised by the debtors essentially constitute an appeal of the state court foreclosure judgment, this court cannot entertain those arguments.

Third, Sparrow's contention that the debtors have no standing to bring an avoidance action against it must be rejected. Under sections 522(g) and (h) of the Bankruptcy Code, Chapter 13 debtors have the authority to avoid a transfer in place of the Chapter 13 trustee, in the event that the debtors could have exempted the property if the trustee had successfully prosecuted the avoidance action. See 11 U.S.C. §§ 522(g),(h); see also In re Dickson, 655 F.3d 585, 592 (6th Cir. 2011) ("a Chapter 13 debtor has standing to avoid a transfer under § 522(h) if five conditions are met: (1) the transfer was not voluntary; (2) the transfer was not concealed; (3) the trustee did not attempt to avoid the transfer; (4) the debtor seeks the avoidance pursuant to §§ 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code; and (5) the transferred property is of a kind that the debtor would have been able to exempt from the estate if the trustee had avoided the transfer under one of the provisions in § 522(g)"). In this case, if the Chapter 13 trustee had successfully prosecuted an avoidance

6

action, it appears that the debtors could have asserted their exemptions against the proceeds of the property.

Fourth, the debtors pose the prospect that they might succeed in avoiding the transfer of their property to Sparrow under 11 U.S.C. § 547, the section governing the avoidance of preferential transfers.  Pursuant to section 547(b), a critical component of a successful preference action is that the transfer occurred "on or within 90 days before the date of the petition."  11 U.S.C. § 547(b)(4)(A).  The transfer at issue in this case occurred on June 20, 2013.  Excluding the first day triggering the period and counting the final day, as directed by FED.R.BANKR.P. 9006(a)(1), the 90 day preference period would have extended back only to June 21, 2013, one day after the transfer occurred.  There is no suggestion in this record that the creditor may be characterized in any way as an insider, as defined under 11 U.S.C. § 101(31), which would have extended the preference period to one year.  11 U.S.C. § 547(b)(4)(B).  Because the transfer occurred outside of the 90 day period before the debtors' bankruptcy filing on September 19, 2013, any potential preference action must fail.

As a further defense to the motion for relief from the automatic stay, the debtors also pose the prospect of successfully avoiding the transfer of their property as a fraudulent transfer.  While no adversary proceeding has yet been commenced to recover the debtors' property on fraudulent transfer grounds, as

7

would be required under FED.R.BANKR.P. 7001(1), we must consider whether such an action, if filed, might be successful.

Pursuant to section 548, a trustee can avoid transfers involving actual or constructive fraud. Section 548(a)(1)(A), describing actual fraud, authorizes a trustee to avoid a transfer made "with actual intent to hinder, delay, or defraud any entity to which the debtor was or became . . . indebted." 11 U.S.C. § 548(a)(1)(A). Subsection 548(a)(1)(B) addresses constructive fraud. Constructive fraud "is presumed once the plaintiff establishes the requisite elements." In re Fruehauf Trailer Corp., 444 F.3d 203, 210 (3d Cir. 2006). Those elements include:

>    (1) the debtor had an interest in property;
>
>    (2) a transfer of that interest occurred within one year of the bankruptcy filing;
>
>    (3) the debtor was insolvent at the time of the transfer or became insolvent as a result of the transfer; and
>
>    (4) the transfer resulted in no value for the debtor or the value received was not "reasonably equivalent" to the value of the relinquished property interest.

Id. at 210-11.

The first three elements are readily established on this record. The debtors had an interest in the subject property. The "transfer" occurred within one year of the bankruptcy filing and the debtors became insolvent as a result

8

of the transfer. The definition of a transfer under 11 U.S.C. § 101(54) includes involuntary transfers and transfers involving foreclosure of the debtor's equity of redemption. Our focus here is on whether the transfer in this case was for "less than a reasonably equivalent value." 11 U.S.C. § 548(a)(1)(B).

The seminal case on section 548 in the context of foreclosures, and the focus of the parties in this case, is <u>BFP v. Resolution Trust Corp.</u>, 511 U.S. 531, 114 S. Ct. 1757, 128 L.Ed.2d 556 (1994). In <u>BFP</u>, the debtor partnership held property subject to two mortgage liens. When BFP defaulted under the terms of the first mortgage, the lender foreclosed and the property was sold at a sheriff's sale for $433,000, an amount that satisfied the two mortgages. Approximately three months later, BFP filed for protection under Chapter 11 of the Bankruptcy Code and sought to avoid the foreclosure sale as a fraudulent transfer under 11 U.S.C. § 548. The debtor asserted that the property was worth over $725,000 at the time of the sale. Therefore, the debtor asserted that it did not receive "reasonably equivalent value" in exchange for the property.

The Supreme Court examined the manner in which the phrase "reasonably equivalent value" must be interpreted in the context of a mortgage foreclosure sale, and held that a "reasonably equivalent value" for foreclosed real property is the price in fact received at the foreclosure sale, so long as all the requirements of the state's foreclosure law have been complied with. The

9

Court rejected fair market value as the benchmark for determining reasonably equivalent value, citing to the definition of fair market value in Black's Law Dictionary, which contrasts fair market value with the value that may be achieved at public auction or forced sale.

> "The market value of … a piece of property is the price which it might be expected to bring if offered for sale in a fair market; not the price which might be obtained on a sale at public auction or a sale forced by the necessities of the owner, but such a price as would be fixed by negotiation and mutual agreement, after ample time to find a purchaser, as between a vendor who is willing (but not compelled) to sell and a purchaser who desires to buy but is not compelled to take the particular … piece of property."

Id. at 537-38, 114 S. Ct. at 1761 (quoting Black's Law Dictionary 971 (6th ed. 1990)). Focusing on the manner in which foreclosed property is sold, the Court canvassed state foreclosure procedures, noting that foreclosure laws, in addition to providing notice to the borrower, typically require publication of a notice of sale, and "strict adherence to prescribed bidding rules and auction procedures." Id. at 542, 114 S. Ct. at 1763. Presumably, by these comments, the Court was opining that state procedures are designed to solicit prospective purchasers and control auction processes in order to maximize the value achieved at such sales. The Court recognized the difficulty of valuing a property that must be sold within the strictures of state-prescribed foreclosure procedures, noting that "property that must be sold within those strictures is simply worth less." Id. at 539, 114 S. Ct. at 1762 (emphasis in original).

10

The Court underscored its vision that a procedurally valid foreclosure sale produces a price that confirms the property's actual value under the circumstances, thereby satisfying the concept of reasonably equivalent value.

> Any irregularity in the conduct of the sale that would permit judicial invalidation of the sale under applicable state law deprives the sale price of its conclusive force under § 548(a)(2)(A), and the transfer may be avoided if the price received was not reasonably equivalent to the property's actual value at the time of the sale (which we think would be the price that would have been received if the foreclosure sale had proceeded according to law).

Id. at 545-46, 114 S. Ct. at 1765. Further, the Court noted that

> foreclosure has the effect of completely redefining the market in which the property is offered for sale; normal free-market rules of exchange are replaced by the far more restrictive rules governing forced sales. Given this altered reality, and the concomitant inutility of the normal tool for determining what property is worth (fair market value), the only legitimate evidence of the property's value at the time it is sold is the foreclosure sale price itself.

Id. at 548-49, 114 S. Ct. at 1767. In short, the Court concluded that the price achieved at a regularly conducted, properly noticed foreclosure sale conclusively establishes that price as the reasonably equivalent value for the property.

Here, the question posed is whether the conclusion drawn by the Supreme Court in BFP in the context of a mortgage foreclosure sale must also be applied in the context of a transfer, under the New Jersey Tax Sale Law, of title to property from a debtor to a tax sale certificate holder upon the entry of a judgment of possession.

11

I conclude that the answer is no. The reason is simple. Under the New Jersey Tax Sale Law, at the point of the entry of a judgment of foreclosure, there is no sale, forced or otherwise. There is simply the foreclosure of the debtor's equity of redemption, and the transfer of a fee simple interest in the property to the tax sale certificate holder. N.J.S.A. § 54:5-87. In contrast, mortgage foreclosure processes in New Jersey customarily involve the entry of a judgment of foreclosure in favor of the mortgagee, followed by a sale process conducted by the sheriff of the county where the property is located. The sale is governed by N.J.S.A. §§ 2A:61-1 to 21, which, among other things, delineates public advertisement requirements preceding the sale, N.J.S.A. § 2A:61-1, and specifies auction requirements, N.J.S.A. § 2A:61-4. See also In re McGrath, 170 B.R. 78, 81 (Bankr. D.N.J. 1994). Following the sheriff's sale and the expiration of a 10 day period to object to the sale, see N.J. COURT RULE 4:65-5, the successful purchaser receives title to the property free and clear of all subsequent encumbrances joined in the foreclosure action. N.J.S.A. § 2A:50-37; In re McGrath, Id.

Unlike the acquisition of title to property by a purchaser through a mortgage foreclosure sheriff's sale, which follows extensive public advertisement and a public auction, the acquisition of free and clear title to property by a tax sale certificate holder through the foreclosure of a debtor's equity of redemption involves no sale, no notice requirements to third parties, no auction procedures, and no other exposure to the marketplace in any way.

The New Jersey tax foreclosure process was described succinctly by Judge Stripp in the <u>McGrath</u> case, as follows:

> The New Jersey Tax Sale Law provides a municipality with a lien on land for taxes which are assessed on such land.  N.J.S.A. § 54:5-6; 34 MICHAEL A. PANE, NEW JERSEY PRACTICE, LOCAL GOVERNMENT LAW, § 244 (1993).  If taxes are not paid, the municipality is entitled to enforce this lien by selling the property.  N.J.S.A. § 54:5-19.  Notice of the sale must be given by posting in the five most public places in the municipality, and in a newspaper circulating within the municipality.  N.J.S.A. §§ 54:5-25 to 26.  The purchaser at such a sale received a tax certificate which is a lien that remains subject to the right of redemption.  N.J.S.A. § 54:5-54.  After this two-year period, the purchaser is entitled to proceed to foreclose the right of redemption under N.J.S.A. § 54:5-86.  When a final judgment is entered, "an absolute and indefeasible estate of inheritance in fee simple" is vested in the purchaser, and any application to reopen the judgment must be heard by the court within three months and then only on the grounds of lack of jurisdiction or fraud.  N.J.S.A. § 54:5-87.

170 B.R. at 81.

In the context of New Jersey tax sale certificate foreclosures, the sale aspect of the transaction occurs at least two years before the transfer of title to the property, when the municipality that is owed a tax by the debtor sells its lien against the debtor's property to a successful bidder.  The auction process for the purchase of a tax sale certificate has similar noticing requirements to mortgage foreclosure sales, <u>see</u> N.J.S.A. § 54:5-26, but the process does not relate to the value of the property.  The amount bid on by prospective purchasers of the tax sale certificate is the same for all purchasers.  It is the amount of the outstanding charges owed to the municipality. N.J.S.A. § 54:5-25 and 5-31.  The successful purchaser is the purchaser who bids for the

13

property "subject to redemption at the lowest rate of interest, but in no case in excess of 18% per annum." N.J.S.A. § 54:5-32.  In other words, the bidders are only bidding on the interest rate to be paid to them by the debtor in the event that the debtor redeems the certificate.[3]  If the two year redemption period expires without redemption by the debtor, and the successful purchaser achieves a judgment of foreclosure, fee simple title to the property vests in the purchaser.  The purchaser will have paid the amount of the outstanding municipal charges due on the property.  The "value" received by the debtor, i.e., the satisfaction of the outstanding tax debt due to the tax sale certificate holder, has no relation to the value of the property being transferred.  The concept of "reasonably equivalent value" cannot rest on the amount of tax debt paid by the purchaser two years prior to the transfer of title.

This case may be a perfect example of the fact that "reasonably equivalent value" cannot be ascertained from a tax sale foreclosure under New Jersey law.  The tax debt against this property is about $36,000, while the value of the property may be at least $100,000 greater than the amount of the debt that was satisfied by the transfer.  The debtors allege that Sparrow has offered the property for sale for $279,000.  The property was not offered for sale prior to the transfer of title, i.e., prior to the entry of the judgment of foreclosure.

---

[3]     The only qualification here is that if bidders offer to purchase a tax sale certificate subject to redemption at no interest to the debtor, the successful purchaser will be the bidder who offers the highest premium "over and above the amount of taxes, assessments or other charges . . . due the municipality." N.J.S.A. § 54:5-32.

14

In a recent opinion on this subject, Judge Kaplan concluded that the holding of BFP, focusing as it does on mortgage foreclosure sales, does not apply to transfers occurring in the context of New Jersey tax foreclosure proceedings. He observed that with regard to tax sales,

> public bidding occurs at the inception of the process, within months after the delinquency, and is limited to the rate of interest on the unpaid taxes (which amounts have little connection to the value of the property). Similarly, the fixed redemption amount at the time of foreclosure of the tax sale certificate is calculated from the accrued taxes and interest thereon, not the value of the underlying property.

In re Berley, 492 B.R. 433, 439 (Bankr. D.N.J. 2013). Judge Kaplan cited to In re McKeever, 166 B.R. 648, 650–51 (Bankr. N.D.Ill. 1994), for the fundamental proposition that "[t]here is no correlation between the sale price [of a tax sale] and the value of the property." Id. I agree with Judge Kaplan, and others who have rejected the automatic extension of BFP to tax foreclosures without consideration of the nature of the state law tax sale processes. See, e.g., City of Milwaukee v. Gillespie, 487 B.R. 916, 920 (E.D.Wis. 2013) ("a judgment of foreclosure, based solely upon delinquent taxes in a non-sale foreclosure proceeding, does not necessarily provide a property owner 'reasonably equivalent value' for real estate without a public sale offering"); In re Smith, Adv. No. 07 A 00239, 2013 WL 3936357, *3 (Bankr. N.D.Ill. July 30, 2013) ("This court views the absence of competitive bidding and other procedures that ensure that a fair value is received for the transferred property as a significant bar to adjudicating 'reasonably equivalent value' in a tax sale context."); In re Murphy, 331 B.R. 107, 120 (Bankr. S.D.N.Y. 2005) ("A plaintiff has stated a

claim that reasonably equivalent value was not obtained for a property seized by tax forfeiture where the state's procedure for tax forfeiture does not provide for a public sale with competitive bidding.").

Since the BFP case was decided, the issue of the import of the case on tax foreclosure sales has been vigorously debated in the courts, and many courts have opined that the reasoning of BFP applies with equal force to tax foreclosures. In addition to the two New Jersey cases that have so ruled, including In re McGrath, supra, and In re 2435 Plainfield Avenue, Inc., 72 F. Supp. 2d 482 (D.N.J. 1999), aff'd, 213 F.3d 629 (3d Cir. 2000), two Courts of Appeal have also joined this camp, including In re T.F. Stone Co., 72 F.3d 466 (5th Cir. 1995) and In re Grandote Country Club, Ltd., 252 F.3d 1146 (10th Cir. 2001). See also In re Washington, 232 B.R. 340 (Bankr. E.D.Va. 1999); In re Lord, 179 B.R. 429 (Bankr. E.D.Pa. 1995).

In In re T.F. Stone, ad valorem taxes were due to Bryan County, Oklahoma. Post-petition, without notice of the bankruptcy, the county conducted a tax foreclosure sale. No bidders came forward, whereupon the county took title to the property, subject to the debtor's two-year redemption period. The debtor failed to redeem, and the county conducted a "Tax Resale", selling the property to a third party for $325. Thereafter, the debtor repurchased the property from the third party for $39,500. 72 F.3d at 468.

16

The debtor filed suit against the county, claiming that the county engaged in an unauthorized post-petition transaction, and seeking money damages from the county under 11 U.S.C. §§ 549 and 550. The county defended on § 549(c) grounds, i.e., that the transfer was made "to a good faith purchaser without knowledge of the commencement of the case and for present fair equivalent value." 11 U.S.C. § 549(c). The parties did not dispute that the third party purchaser was a good faith purchaser without knowledge of the bankruptcy. The focus was on whether "present fair equivalent value", which the court equated with the "reasonably equivalent value" requirement of the constructive fraud section, § 548, was achieved when the "Tax Resale" took place. Id. at 470. Relying on BFP, the court concluded that the principles applicable to mortgage foreclosure sales were equally applicable to sales conducted to satisfy delinquent tax obligations, leading to the ultimate conclusion that the price actually achieved in the context of a regularly conducted tax sale represents a "fair equivalent value" for the property. Id. at 471.

The T.F. Stone decision cannot be applied here because the court in that case was focusing on the consequences of a "Tax Resale" under Oklahoma law. The procedure for tax resales under Oklahoma law exposes the property to the marketplace, with public advertisement and auction processes.[4] When the T.F.

---

[4] Under Oklahoma state law, the county treasurer is required to publish notice in local newspapers, and provide notice by certified mail to the owner, of any intent to sell real property to satisfy delinquent real estate taxes. Okla. Stat. tit. 68 §§ 3105; 3106. The sale is subject to

17

Stone court compared mortgage foreclosure sales to tax sales, it was comparing procedures that are both appropriately characterized as forced sales that expose the property to the marketplace. The court concluded that both mortgage foreclosure sales, as described in BFP, and forced tax sales under Oklahoma state law produce value that is reasonably or fairly equivalent under the circumstances. See also In re Grandote Country Club, Ltd., 252 F.3d 1146, 1152 (10th Cir. 2001)("[T]he decisive factor in determining whether a transfer pursuant to a tax sale constitutes 'reasonably equivalent value' is a state's procedure for tax sales, in particular, statutes requiring that tax sales take place publicly under a competitive bidding process. . . . RTV (the successful purchaser) acquired the property through a regularly conducted tax sale under Colorado law subject to a competitive bidding procedure.").

As I described above, we have a different circumstance in this case. The transfer sought to be avoided here, which occurred three months prior to the debtors' bankruptcy filing, foreclosed the debtors' equity of redemption. There was no public advertisement or competitive bidding process. The price actually

---

a period of redemption. Okla. Stat. tit. 68 § 3113. If no one purchases the property, the county retains the tax lien. If the property remains unredeemed at the end of the redemption period, the treasurer can then sell the property pursuant to statutory resale provisions. Okla. Stat. tit. 68 § 3125. These provisions also require notice of the sale to be published in local newspapers and notice to the owner and any mortgagees by certified mail. Okla. Stat. tit. 68 § 3127. The notice must indicate that the sale will go to the "highest bidder for cash." Id. The sale is by public auction and cannot be less than 2/3 of the current assessed value for the property or the amount of outstanding taxes and associated costs, whichever is lesser. Okla. Stat. tit. 68 § 3129.

achieved by the transfer, i.e., the satisfaction of tax debt against the property, cannot represent "reasonably equivalent value" for the property.

In reaching the conclusion that the holding of BFP does not preclude the avoidance of the pre-petition transfer of the debtors' property under section 548(a)(1)(B), I readily acknowledge the deference shown by the Court to "the essential sovereign interest [of state governments] in the security and stability of title to land". BFP v. Resolution Trust Corp., 511 U.S. at 545 n.8, 114 S. Ct. at 1765 n.8. The Court expressed concern that exposing mortgage foreclosure sales to avoidance under the constructive fraud provision of the Bankruptcy Code "would have a profound effect upon that interest: The title of every piece of realty purchased at foreclosure would be under a federally created cloud." Id. at 544, 114 S. Ct. at 1765. But the Court qualified and limited its holding as follows: "We emphasize that our opinion today covers only mortgage foreclosures of real estate. The considerations bearing upon other foreclosures and forced sales (to satisfy tax liens, for example) may be different." Id. at 538 n.3, 114 S. Ct. at 1761 n.3. The Court thus expressly left open the prospect that transfers occurring in the context of "tax sale" may be avoidable under § 548.

The context in which the BFP issue arises here is the potential avoidance of the transfer of the debtors' property under § 548, which is raised as a defense to Sparrow's motion to vacate the automatic stay. If the debtors intend

19

to file an adversary proceeding to avoid the transfer under § 548(a)(2), they must do so within ten (10) days of the date of the entry of an order on this motion.  See In re Lebbos, 455 B.R. 607, 614 (Bankr. E.D.Mich. 2011) ("any such defenses or counterclaims raised during a § 362(d) hearing, would and should still be pursued in the context of an adversary proceeding for a final decision on their merits"); In re Hurst, 409 B.R. 79, 83 (Bankr. D.Md. 2009) ("While a court may consider counterclaims that strike at the core of a movant's secured interest, any such decision should only be preliminary, pending an adversary proceeding.").  If the complaint fails, relief from the stay will be granted.  On this record, relief from the stay is denied without prejudice.

      Debtors' counsel shall submit an order in conformance with this opinion.

Dated:  December 13, 2013

                                        JUDITH H. WIZMUR
                                        JUDGE, U.S. BANKRUPTCY COURT